* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Deluca with modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission. The Industrial Commission has jurisdiction of the parties and of the subject matter.
2. Insurance coverage for the injuries alleged herein was in effect at the time of the alleged accident.
3. Plaintiff was hired on June 3, 2000, and worked as a wash line operator for Defendant-Employer.
4. Plaintiff received compensation at the rate of $213.85, which equaled an average weekly wage of $320.00, subject to wage chart verification.
5. Plaintiff's date of injury is July 3, 2000, and she sustained an injury to her left elbow.
6. This claim was accepted via a Form 60 filed May 1, 2001.
7. Plaintiff continued to work for defendant-employer until July 3, 2002, when defendant-employer was unable to continue accommodating plaintiff's work restrictions and she was released from employment.
8. Plaintiff has received all wage benefits for any lost work time.
9. Plaintiff obtained new employment effective April 23, 2003, and is currently employed with another employer.
10. Plaintiff's 2004 tax return showed plaintiff earned $27,762.00 with her new employer.
11. Plaintiff was released from medical care with a twelve percent (12%) permanent partial disability rating to her left arm.
12. The parties stipulated the following documents into evidence at the hearing: *Page 3 
 (a) Industrial Commission Forms;
 (b) Plaintiff's Medical Records;
 (c) Indemnity Payments to Plaintiff by Defendant-Carrier;
 (d) Plaintiff's Responses to Defendants' Discovery; and
 (e) Medical Payments made by Defendant-Carrier.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 36 years old at the time of the hearing before the Deputy Commissioner.
2. Plaintiff was hired by defendant-employer on June 3, 2000, to work as a wastewater operator.
3. On July 3, 2000, Plaintiff sustained a compensable injury to her left elbow while working for defendant-employer. On this date, plaintiff was hoisted up on a forklift transferring flake (ground up plastic bottles) out of a broken box into a good box. While transferring the flake, the pallet underneath the box broke, causing plaintiff to fall eight or nine feet to the cement floor, landing on her elbow. Plaintiff immediately reported her accident to Human Resources Director Barry McCuiston.
4. Approximately two weeks after the July 3, 2000 accident occurred, Plaintiff's pain in her left upper extremity increased to the point that she sought treatment with Dr. Jeffrey Daily at the Miller Clinic in Monroe, North Carolina. Dr. Daily examined plaintiff and performed x-rays of her left elbow. Dr. Daily indicated that he felt that she was neurologically intact but that she *Page 4 
exhibited labored motion around the elbow with some lateral tenderness. Dr. Daily restricted Plaintiff's gripping and other activities at work until what he felt to be a contusion of her left elbow resolved.
5. Dr. Daily continued these restrictions on July 31, 2000, and placed plaintiff in an elbow sleeve to restrict her motion. He noted that plaintiff seemed to be doing much better, though she was continuing to have some limited range of motion. Gradually, plaintiff began experiencing symptoms in her left ring and pinkie finger that led Dr. Daily to believe that she had an ulnar nerve condition, possibly cubital tunnel syndrome. He ordered electrodiagnostic testing in November 2000 to detect any neuropathy, but the testing came back negative. Dr. Daily indicated that a negative test result sometimes occurs with cubital tunnel syndrome, so he continued plaintiff on Celebrex.
6. When Plaintiff returned to see Dr. Daily in January 2001 with continued symptoms in her elbow and fifth finger, he suggested surgery on the ulnar nerve in plaintiff's left elbow.
7. Plaintiff obtained a second surgical opinion from the Carolina Hand Center on March 12, 2001. On that date, plaintiff met with Dr. Warren B. Burrows. He concurred with Dr. Daily's diagnosis of cubital tunnel syndrome, but also diagnosed carpal tunnel syndrome.
8. Rather than proceed with surgical intervention, Dr. Burrows recommended that plaintiff try a Medrol dosepak, cortisone injections, a padded elbow sock, and wrap. Dr. Burrows also recommended another nerve conduction study. Dr. Burrows indicated that plaintiff should continue with her work restrictions limiting repetitive use of her left upper extremity, and gave plaintiff a three to five pound weight limitation.
9. Plaintiff used the padded elbow sock and wrap without relief, and her second nerve conduction study came back within normal limits. However, plaintiff continued to experience *Page 5 
extreme discomfort in her left upper extremity. Based upon this information, Dr. Burrows recommended that plaintiff proceed with surgery.
10. Plaintiff had ulnar nerve surgery on April 10, 2001, and began physical therapy soon thereafter. Dr. Burrows released plaintiff to light-duty work status on May 7, 2001, even though plaintiff was continuing to experience pain and swelling in her left upper extremity for which she was taking narcotic medication.
11. Dr. Burrows found plaintiff to be at maximum medical improvement on September 17, 2001. Plaintiff had continued pain and tenderness in her left elbow and fourth and fifth fingers. Her grip strength was recorded as 65 pounds on the right side and 35 pounds on her left side. Based upon these factors, Dr. Burrows assigned a fifteen percent (15%) permanent partial disability rating to plaintiff's left arm. He also assigned plaintiff permanent restrictions of frequent lifting of no greater than ten pounds, occasional lifting of no greater than 15 pounds, and no continuous lifting. With respect to other activities, Dr. Burrows directed that plaintiff not perform repetitious tasks with her left upper extremity, that she not perform any shoveling, and that she not use any vibratory tools or impact tools with her left arm. Though Dr. Burrows felt that Plaintiff might ultimately require a full submuscular anterior transposition of the ulnar nerve, he did not recommend the procedure at the time.
12. Plaintiff's pain persisted, so Dr. Burrows ultimately performed a full submuscular anterior transposition of the ulnar nerve in April 2002. Three weeks following surgery, plaintiff's pain was less and she seemed more comfortable to Dr. Burrows.
13. Plaintiff reached maximum medical improvement from this second procedure on July 1, 2002. Dr. Burrows noted that Plaintiff had continued pain in her left elbow and weakness in her fourth and fifth fingers, but she was better than she had been prior to her second surgery. Her *Page 6 
grip strength on the right was 55 pounds and 40 pounds on the left. Dr. Burrows reduced plaintiff's permanent partial disability rating to the left arm to twelve (12%) due to the decrease in her level of pain. Dr. Burrows continued plaintiff on restrictions of no repeated flexion and extension of the elbow, no lifting greater than five pounds with the left hand and no use of any tools with the left hand.
14. The defendant-employer was unable to accommodate the restrictions given to plaintiff by Dr. Burrows, and terminated plaintiff on July 3, 2002. Plaintiff began looking for work within her restrictions and received temporary total disability benefits for the period of July 3, 2002, through April 23, 2003, when she found work with another employer, Carolina By-Products, at a wage that was equal to or greater than her pre-injury average weekly wage.
15. Plaintiff returned to Dr. Burrows on October 7, 2002, because she felt that she was experiencing a worsening of her condition. Plaintiff had numbness and weakness in her left elbow and fourth and fifth fingers. Plaintiff testified that she suffered daily with a loss of sensation in her elbow, experienced pain with movement of the wrist, had lost sensation in the fingers of the left hand, had pain in the center of her hand, and had suffered a loss of grip strength and dexterity. She also had begun experiencing sharp shooting pains in her left hand approximately two to three times per day. Dr. Burrows felt that plaintiff's condition was the same and discharged her from his care. Dr. Burrows continued plaintiff on her same restrictions at this time.
16. Because plaintiff continued to experience pain and numbness in her left upper extremity, she attempted several times to return to see Dr. Burrows after October 7, 2002. Defendant-carrier refused to authorize plaintiff to return to see Dr. Burrows. For this reason, Plaintiff has not had any further medical treatment on her left upper extremity, though her *Page 7 
symptoms continued to cause her pain and discomfort through the date of hearing before the Deputy Commissioner.
17. Dr. Burrows testified that plaintiff's restrictions included no lifting over five pounds and no forceful grasping. He also testified that exceeding these restrictions would aggravate plaintiff's symptoms, specifically noting that "forceful grasping to open up a new jar of jam or trying to turn a rusty key in a rusty lock, that would be the kind of force that I guess we could imagine to be that would I think put excessive strain on the area of surgery."
18. Dr. Burrows testified, and the Full Commission finds, that some of these restrictions were subjective. For example, Dr. Burrows confirmed that the five-pound lifting restriction that he imposed was "ballpark." If plaintiff attempted to lift three pounds and found that she could not do so without pain, Dr. Burrows testified that she should adhere to that three-pound limitation. He also testified that restrictions are subjective to the tolerance of the patient such that if plaintiff testified that she could not perform certain tasks without pain, then he would not expect her to perform those tasks even if her written restrictions indicated that she could.
19. Dr. Burrows testified, and the Full Commission finds as fact, that it would be reasonable for Plaintiff to seek medical treatment to obtain prescription medication. Dr. Burrows also testified that her pain level would continue to increase as long as she participated in any activity in excess of her restrictions. Dr. Burrows further testified that such an exacerbation of pain would warrant a visit to a medical provider to obtain prescription medication. Dr. Burrows testified, and the Full Commission finds as fact, that Plaintiff would require prescription pain medication periodically as her pain increases and decreases over the years. Thus, the Full Commission finds that such medical treatment is reasonable and necessary to monitor plaintiff's condition. *Page 8 
20. On or about April 23, 2003, plaintiff began working as a dispatcher with Carolina By-Products in Wadesboro, North Carolina, at a wage that was equal to or greater than her pre-injury average weekly wage. Plaintiff testified that Carolina By-Products was aware of her restrictions when they hired her. Thus, the Full Commission finds that plaintiff's employment with Carolina By-Products was obtained in the competitive job market.
21. Although conflicting evidence on this point was offered, it is found as a fact that plaintiff's duties as a dispatcher with Carolina By-Products include taking samples from trucks that entered the scale house at Carolina By-Products, preparing "composites" to send to the home office, and typing and preparing reports. The samples are stored, and the half-gallon jars of "composites" are sent to the home office.
22. Plaintiff testified that she has experienced difficulty in performing all of her job duties for Carolina By-Products because she cannot lift the accumulated weight of the individual samples when poured into the composite jar. Plaintiff is concerned that she may lose her job because she cannot perform all of her duties and alleges that her job has been overly modified and is not indicative of her wage-earning capacity in the competitive labor market. However, plaintiff's supervisor at Carolina By-Products, Roger Dunhoft, testified that plaintiff performed all of the tasks of a dispatcher and that her duties as a dispatcher did not differ from any of the other dispatchers. Further, Mr. Dunhoft testified that plaintiff never complained of any problems in performing her job duties, and stated that plaintiff always completed her work. Although Mr. Dunhoft is no longer with Carolina By-Products as of December 2, 2005, plaintiff has provided no evidence to show that her employment with Carolina By-Products is in jeopardy. Plaintiff offered no testimony at hearing that she had been reprimanded or warned because she was unable to perform her job. In fact, plaintiff admitted she received at least one raise during her *Page 9 
employment with Carolina By-Products. As of the date of hearing before the Deputy Commissioner, plaintiff continued to work for Carolina By-Products. The Full Commission finds there to be insufficient evidence to find that plaintiff's job duties with Carolina By-Products have been modified and, thus, finds that plaintiff has shown that she is capable of employment in the competitive market at wages that are equal to or greater than her pre-injury average weekly wage.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident on July 3, 2000. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff received temporary total disability benefits from July 3, 2002, the date of her termination by defendant-employer, to April 23, 2003, the date plaintiff obtained other employment at wages equal to or greater than her pre-injury wages. N.C. Gen. Stat. § 97-29.
3. In asserting that she is entitled to temporary total disability benefits under N.C. Gen. Stat. § 97-29 for constructive disability, plaintiff has relied on Peoples v. Cone Mills Corp., 316 N.C. 426,342 S.E.2d 798 (1986), claiming that her current job is modified and, thus, an unreliable basis for determining her wage earning capacity. InPeoples the N.C. Supreme Court held a stock room supply job offered to the employee by the defendant-employer was insufficient evidence of the employee's ability to earn wages because the employee would not have been able to obtain a similar position at the same wage with any other employer. Id. at 438, 806. The Court stated "proffered employment would not accurately reflect earning capacity . . . if [it] is so *Page 10 
modified because of the employee's limitations that it is not ordinarily available in the competitive job market." Id. However, the Full Commission finds the present case to be distinguished fromPeoples in that the employment at issue with Carolina By-Products was actually obtained by plaintiff in the competitive market, and was not proffered by the defendant-employer. The Full Commission declines to interpret Peoples as holding that employment that was obtained in the competitive job market, and not proffered by the defendant-employer, is insufficient evidence of wage-earning capacity. The Full Commission further finds there to be insufficient evidence to find that plaintiff's job duties with Carolina By-Products have been modified and, thus, finds that plaintiff has shown that she is capable of employment in the competitive market at wages that are equal to or greater than her pre-injury average weekly wage. Thus, plaintiff has failed to show that she is entitled to temporary total disability benefits under N.C. Gen. Stat. § 97-29 for constructive disability.
4. Plaintiff is entitled to her most munificent remedy under the Workers' Compensation Act. See Vernon v. Mabe, 336 N.C. 425, 431,444 S.E.2d 191, 194 (1994). Plaintiff has argued that because her condition could worsen in the future, she should not be required to make an election at this juncture. The record shows that plaintiff is capable of employment in the competitive market at wages that are equal to or greater than her pre-injury average weekly wage and, thus, is not entitled to further benefits under N.C. Gen. Stat. §§ 97-29 or 97-30. Thus, the only remedy available to plaintiff at this juncture is to receive payment for the twelve percent (12%) permanent partial disability rating to her left arm per N.C. Gen. Stat. § 97-31(13). Dr. Burrows found plaintiff to be at maximum medical improvement following her second surgery on July 1, 2002, and assigned the twelve percent (12%) rating to plaintiff's left arm. Maximum medical improvement is defined as the point which the condition or injury has stabilized *Page 11 
with respect to further improvement. Horne v. Universal Leaf TobaccoProcessors, 119 N.C. App. 682, 459 S.E.2d 797 (1995). Dr. Burrows testified that as of July 1, 2002, plaintiff's injury had stabilized. Based on the evidence of record, plaintiff has provided no rational basis — in law or fact — upon which to find that plaintiff should be able to defer the only remedy available to her at this juncture, which is to receive payment for the twelve percent (12%) permanent partial disability rating to her left arm per N.C. Gen. Stat. § 97-31(13).
5. Plaintiff has shown that she would benefit from additional treatment with Dr. Burrows that is reasonably necessary to provide relief, including prescription pain management as recommended by Dr. Burrows. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee provided herein, defendants shall pay to plaintiff permanent partial disability compensation for the twelve percent (12%) disability rating to plaintiff's left arm at the weekly rate of $213.85 for 28.8 weeks, which totals $6,158.88. Because this compensation has accrued, it shall be paid to plaintiff in a lump sum.
2. Defendants shall provide to plaintiff medical treatment reasonably necessary to provide relief to her left arm, including prescription pain management as recommended by Dr. Burrows.
3. Defendants shall pay to plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff herein. Because *Page 12 
the compensation upon which such compensation is based has accrued, defendants shall pay plaintiff's counsel in a lump sum.
4. Defendants shall pay the costs.
This 20th day of February 2007.
 S/________________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/__________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/__________________________ DIANNE C. SELLERS COMMISSIONER *Page 1